**Law Offices Of Polachek & Associates, P.C.**
BY: RICHARD A. POLACHEK, ESQUIRE and THOMAS P. CLARK, ESQUIRE
ATTORNEY FOR: DEFENDANT, SUSAN WZOREK
IDENTIFICATION NO. 35283 and 90673
PHOENIX PLAZA
22 EAST UNION STREET, SUITE 600
WILKES-BARRE, PA 18701-2723
(570) 822-8515
FAX (570) 822-5748
PolachekLaw@epix.net

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MASON, et. al | : | No.: 06-1898 |
| | : | |
| Plaintiffs | : | |
| | : | Assigned to Honorable |
| vs. | : | Richard A. Caputo |
| | : | |
| NORTHEASTERN EDUCATIONAL | : | |
| INTERMEDIATE UNIT, et al. | : | |
| | : | |
| Defendants | : | Jury Trial Demanded |

---

### DEFENDANT, SUSAN COMERFORD WZOREK'S,
### BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

**DESCRIPTION**                                                    **PAGE(S)**

I.      PROCEDURAL HISTORY ............................................    1

II.     STATEMENT OF FACTS ...........................................    2

III.    STATEMENT OF QUESTIONS INVOLVED ..........................    25

IV.     ARGUMENT ........................................................    27

V.      CONCLUSION ......................................................    40

_____

## TABLE OF CITATIONS

**CITATION**                                                       **PAGE(S)**

Fed.R.Civ.P. 56 (c)(e) ...................................................    27

42 Pa.C.S.A. § 8542 et al. ..............................................    38

IDEA 20 U.S.C. 1400 et seq. ..........................................    34

Restatement (Second) of Torts Section 874 (a) (1979) ...............    37

Restatement (Second) of Trusts (b) .................................    37

U.S. Const. amend. XIV, §1 .........................................    32

Anderson v. Liberty Lobby, Inc., 477, U.S. 242, 247- 48, ..........    27
106 S.Ct. 2505, 91 L.Ed. 2d 202 (1986)

Anderson v. Creighton, 483 U.S. 635, 639 (1987) ....................    28, 29

Annika T. v. Unionville Chadds - Ford School District, ............    33, 34
2009 W L 778350 E.D. Pa., March 24, 2009, (NO. CIV. A. 08-4944)

A.W. v. Jersey City Schools, 486, F.3d. 791 (3d Cir. 2007) ......    33

Brandon v. Chichester School District,  ............................    34
No. 06-4687, 2007 WL 2155722 (E.D. Pa. July 25, 2007)

## TABLE OF CITATIONS

__CITATION__                                                        __PAGE(S)__

Bucks County Department of Mental Health/Mental Retardation v. .......... 34
Commonwealth of Pennsylvania, 379 F.3d. 61, 68 (3d Cir. 2004)

Butler v. Stockdale, 19 Pa. Super. 98, 107. (1902) ...................... 35

Celotex Corporation v. Catrett, 477 U.S. 317, 324,   .................. 28
106 S. Ct. 2548, 91 L. Ed. 2d. 265 (1986)

Chamber v. Montgomery, 192 A.2d 355, 358, (Pa. 1963) ......... 39

City of Philadelphia Litigation v. City of Philadelphia, ............................. 30
150 F.3d 711, C.A. 3 (Pa.), Sept.  09, 1998 (No. 96-2127)

Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985) ................ 32

Clement v. Consolidated Rail Corporation , 963 F. 2d. 599,   ................... 27
600 (3d Cir. 1992)

Close v. Voorhees, 67 Pa. Cmwlth. 205, 446 A.2d 728 (1982) ................ 38

Colon v. Colonial Intermediate Unit 20,   .................................... 33
443 F. Supp. 2d. 659, 669 ( N.D. Pa. 2006)

Commonwealth v. Jackson, 907  A.2d 540 (Pa. Super. 2006) ................... 35

County of Sacramento v. Lewis, 523 U.S. 833, 847 (1998) ...................... 31

Dorsch by Dorsch v. Butler Area School District,   .................................... 38
105 Pa. Cmwlth. 519, 525 A.2d 17 (1987)

Edelstein & Diamond, LLP. v. Orloff,   ....................................... 37
2005, WL 1648191 * 2 (Pa. Com. Pl.)

eToll, Inc. v. Elias/Sevion Advertising, Inc.,   ............................................ 37
811 A.2d 1023 (Pa. Super. 2002)

Feld v. Merriam, 485 A.2d 742, 748 (Pa. 1984) ........................................ 39

Gottlieb v. Laurel Highlands School District, 272 F.3d 168, ...................... 31
172 (3d Cir. 2001)

## TABLE OF CITATIONS

<u>**CITATION**</u>                                                                      <u>**PAGE(S)**</u>

<u>Grant v. City of Pittsburgh</u>, 98 F.3d  116, 122, (3d Cir. 1996) .................. 29

<u>Gray v. York Newspapers, Inc.</u>, 957 F.2d. 1070, 1078 (3d Cir. 1992) ....... 27

<u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 817-18 (1982) .................................. 28, 29

<u>Hoy v. Angelo</u>, 691 A.2d 476, 482 (Pa. 1997) ........................................... 35

<u>Johnson v. Horn</u>, 150 F.3d 276, 286 n. 7(3d Cir. 1998) ............................ 29, 30

<u>Jones v. Witinski</u>, 931 F. Supp. 364, 369 (N.D. Pa. 1996)  ....................... 31

<u>Kazatsky v. King David Memorial Park</u>,  ................................................. 36
515 Pa. 183, 197, 527 A.2d. 988 (1987)

<u>Kurilla v. Calahan</u>, 68 F. Supp. 2d. 556, 564 (N.D. Pa. 1999)  ................ 32

<u>Lillard v. Shelby County Board of Education</u>,  ......................................... 32
76 F. 3d 716, 725-26 (6th Cir. 1996)

<u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986) ............................................... 29

<u>Martin v. Johns-Manville Corp.</u>,  494 A.2d, 1088, 1098, (1985) .............. 39

<u>Matsushita Electric Industrial Company v. Zenith Radio</u>,  ....................... 28
475, U.S. 574, 586, S Ct. 1348, 89 L Ed. 2d. 538 (1986)

<u>Messina v. Bairesville-Saltsburg School District</u>,  .................................... 38
94 Pa. Cmwlth. 100, 103 A.2d 89 (1986)

<u>Mooney by Mooney v. North Penn School District</u>, .................................. 38
90 Pa. Cmwlth. 7, 493, A.2d 795 (1985)

<u>Moore v. Tartler</u>, 986 F.2d.., 682 (3d Cir. 1993) ....................................... 27

<u>Nieves -Marquez v. Commonwealth of Puerto Rico</u>,  ............................... 34
353 F. 3d 108, 125 (1st Cir. 2003)

<u>P.N. v. Greco</u>, 282 F. Supp. 2d. 221, 239 (D.N.J. 2003) ........................... 33

## TABLE OF CITATIONS

**CITATION**                                                                 **PAGE(S)**

<u>Pro v Donatucci</u>, 81 F.3d  1283, 1292 (3d Cir. 1996) ................................  30

<u>Rizzo v. Haines</u>, 555 A.2d 58, 69 (Pa. 1989) .............................................  39

<u>Ronald v. The School District of Philadelphia Board of Education</u>, ..........  34
No. 05-2535, 2007 WL 4225584, *10 (E.D. Pa. November 29, 2007)

<u>Sellers v. School Board of Manassas</u>,   .......................................................  34
141 F.3d. 524, 526-28 (4th  Cir. 1998)

<u>Sharrar v. Felsang</u>, 128 F.3d 810, 828 (3d Cir. 1997) ................................  29, 30

<u>Siegert v. Gilley</u>, 500 U.S. 226, 232 (1991) ................................................  29

<u>Strickland v. University of Scranton</u>,   ........................................................  36
700 A.2d. 979, 987 (Pa. Super. 1997)

<u>Taylor v. Altoona Area School District</u>, ......................................................  33
513 F. Supp. 2d. 540 (W.D. Pa., 2007)

<u>Webb v. McCullough</u>, 828 F.2d. 1151, 1158 (6th Cir. 1987) ....................  31

<u>White v. Westinghouse Electric Company</u>, .................................................  27
862 F.2d.. 56, 59 (3d  Cir. 1988)

<u>Winkleman v. Parma City School District</u>, .................................................  33
127 S. Ct. 1994, 2006, 167 L. Ed. 2d. 904, 922 (2007)

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MASON, et. al | : | No.: 06-1898 |
| | : | |
| Plaintiffs | : | |
| | : | Assigned to Honorable |
| vs. | : | Richard A. Caputo |
| | : | |
| NORTHEASTERN EDUCATIONAL | : | |
| INTERMEDIATE UNIT, et al. | : | |
| | : | |
| Defendants | : | Jury Trial Demanded |

**DEFENDANT, SUSAN COMERFORD WZOREK'S,
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**I.    PROCEDURAL HISTORY**

Plaintiffs instituted the above captioned matter by filing a Complaint in the Court of Common Pleas of Lackawanna County on or about May 23, 2006. Following the filing of Preliminary Objections on or about July 18, 2006, by Defendants, Plaintiffs filed an Amended Complaint in the Lackawanna County Court of Common Pleas on or about September 6, 2006.

A Notice of Removal was filed collectively by the Defendants on or about September 26, 2006. Thereafter, on or about October 2, 2006, Defendant, Susan Comerford Wzorek, (hereinafter referred to as "Wzorek") filed a Motion to Dismiss Plaintiffs' Amended Complaint. Thereafter, on or about May 15, 2007, this Honorable Court entered an Order granting Defendant, Wzorek's Motion to Dismiss in part while denying her Motion to Dismiss in part.

Due to an intervening change in control laws as it pertains to Defendants' Motion to Dismiss, Defendants then collectively moved for reconsideration of the Court's May 15, 2007, Order. The Court subsequently granted Defendants' Motion for Reconsideration, and thereafter, on September

1

26, 2007, issued an Order and Memorandum dismissing Count I of Plaintiffs' Amended Complaint.

Plaintiffs subsequently filed a Motion for Leave to file a Second Amended Complaint. Pursuant to Plaintiffs' Motion, the Court entered a Memorandum and Order dated February 1, 2008, denying Plaintiffs' Motion with respect to reinstating any counts previously dismissed by the Court's May 15, 2007, Order, and denying the inclusion of Defendant, Wzorek, in the Section 504 claim, while denying the inclusion of the Willful Misconduct claim in Count XII against all Defendants. By Order of Court dated June 6, 2008, these matters were consolidated for all Discovery and Pre-Trial purposes. This Brief is submitted in accordance with the Court's Order as it pertains to the seven (7) companion cases of Plaintiffs.

It is believed that all parties have provided one another with their disclosures in accordance with the Federal Rules of Civil Procedure. Furthermore, extensive discovery has taken place including the depositions of all the parties as well as other witnesses and individuals pertinent to this litigation. In accordance with the Court's Second Amended Case Management Order, Motions for Summary Judgment and Briefs in support thereof are due to be filed by April 15, 2009. While additional discovery is still ongoing, it is submitted that these matters are ripe for disposition before the Court at this time.

## II.     STATEMENT OF THE FACTS

In Plaintiffs' Second Amended Complaints, there are six remaining counts alleged against Wzorek which include: Count I - Violations of the Fourteenth Amendment Substantive Due Process Claims  for Failure to Protect the Minor Plaintiffs' Bodily Integrity and Violation of the Equal Protection Clause; Count II - Violations of the IDEA 20 U.S.C. Section 1400 et seq.; Count III - Assault and Battery; Count IV - Intentional Affliction of Emotional Distress; Count V - Breach of

Fiduciary Duty; and Count VI - Punitive Damages.

There are a total of seven minor Plaintiffs that have commenced litigation against Wzorek et al.. All minor Plaintiffs were enrolled in the Northeastern Educational Intermediate Unit (NEIU) # 19's autistic support classroom which was housed at the Clark Summit Elementary School for the 2001-2002 and 2002-2003 school year. This class was taught by Wzorek during both years. Some of the minor Plaintiffs were in Wzorek's class for two years while others were only in that class for one year. Plaintiffs' Second Amended Complaints make allegations of abusive conduct by Wzorek during the two years that she taught the autistic support classroom.

The specific allegations against Wzorek are discussed with particularity below, however, copies of Plaintiffs' Second Amended Complaints are attached as exhibits and the specific allegations of abuse can be referenced as follows: (Exhibit "A" - minor B.M., 3:06-cv-1903 paragraphs 39,70); (Exhibit "B" - minor P.D., 3:06-cv-1904 paragraphs 39,71); (Exhibit "C" - minor D.B., 3:06-cv-1899 paragraphs 39,71); (Exhibit "D" - minor R.R., 3:06-cv-1902 paragraphs 38,69); (Exhibit "E" - minor J.M.G., 3:06-cv-1900 paragraphs 39,70); (Exhibit "F" - minor A.J.M., 3:06-cv-1898 paragrpahs 39,71); and (Exhibit "G" - minor J.B. - 3:06-cv-1901 paragraphs 39,70). Aside from the intentional torts and intentional conduct as claimed by the Plaintiffs; Plaintiffs also allege that Wzorek violated the minor Plaintiffs' Individualized Education Programs (IEP).

Due to the allegations being made on behalf of the minor Plaintiffs; Wzorek feels it imperative to look specifically at the deposition testimony taken under oath of Jill Celli and Robin Medeiros, two full time teacher's aides who worked with Wzorek in her classroom, Meredith Jackson and Kathy Smith (Pierce), Therapeutic Support Staff Workers assigned to students in Wzorek's classroom during the operative time period as well as the testimony of Wzorek, in

3

response to those allegations.

    **A.**    **Testimony of Jill Celli (now Jill Touch)** - The deposition of Jill Celli, a teacher's aide in Wzorek's classroom in both the 2001-2002 and 2002-2003 school years, hereinafter referred to as "Celli" is attached and marked as Exhibit "H". Celli was asked when she first noticed action on the part of Wzorek that she felt was inappropriate to which she indicated it was whenever she duct taped one of the students to a Rifton Chair.(Exhibit "H", Pgs. 47-48.)  Celli indicated that Wzorek requested the assistance of Sue Collins, who was a Speech Therapist, to assist her in duct taping a student *T.J.N.* to a Rifton Chair because she could not contain him. (Exhibit "H", Pg. 48). *(It is important to note for purposes of this litigation, that the minor student T.J.N. has not filed a lawsuit against Wzorek.)* While Celli felt that the conduct may have been inappropriate, she claimed that Wzorek told her that she had learned how to restrain children from a seminar. (Exhibit "H", Pg. 49). Celli acknowledged that the use of a Rifton Chair had been used in Wzorek's class, as well as her class the year before which was taught by Cathy Rachkowski. (Exhibit "H", Pg. 50.) Celli testified that the first time she believed that the Rifton Chair was being used inappropriately by Wzorek, was with *T.J.N.* when she used duct tape to restrain him in the chair. (Exhibit "H", Pgs. 52-53).When asked why she never reported the use of duct tape to restrain *T.J.N.* to the NEIU, Celli indicated that she didn't say anything because she was told that Wzorek had learned this in a seminar, and while she thought it was unusual, she just didn't say anything. (Exhibit "H", Pgs. 53-54.) Celli also testified that at no point in time did she ever inform *T.J.N.*'s parents that duct tape was used on their son to restrain him because she didn't feel the need that she was supposed to inform them of that. (Exhibit "H ", Pg. 56).

    As indicated by Celli, the next incident that she felt was inappropriate again involved *T.J.N.*

when he was walking around the room while strapped into a Rifton Chair. (Exhibit "H", Pg. 57.) She indicated that he was secured in the chair by way of a tray that normally attaches to it.(Exhibit "H", Pg. 57). She also indicated that there was an incident when *T.J.N.* was walking around in the Rifton Chair and that it had tipped and he was laying on his side while in the chair and that Wzorek would not allow her to pick him up. (Exhibit "H ", Pg. 57). Celli indicated that T.J.N was laying on his side for a minute or two and that Wzorek picked him up. (Exhibit "H", Pg. 58). Despite indicating that what she saw on this occasion with Wzorek, Celli admitted that at no point in time did she report the same to the NEIU. (Exhibit "H ", Pg. 59).

The next thing noticed by Celli that she felt was inappropriate as far as her observations of Wzorek's conduct were concerned was when she saw D.B. being secured in a Rifton Chair by way of a bungee cord. (Exhibit "H", Pg. 61). Celli claimed that Wzorek, strapped minor Plaintiff, D.B. into the Rifton Chair and attached his feet to the chair, however, he was maneuvering around and actually snapped the bungee cords and they broke while he was in the chair. (Exhibit " H ", Pg. 62). Celli also testified that there was a second occasion when Wzorek utilized the bungee cord on D.B. (Exhibit "H ", Pg. 65). Celli indicated that the events that led up to the use of a bungee cord on the first occasion was that minor Plaintiff, D.B. was defiant and that he liked to act out. (Exhibit "H", Pg. 65). She claims that he would be doing his work or a puzzle and then he would throw it and laugh or run around in circles and that Wzorek would try to grab him and place him in the Rifton Chair to contain him because he was able to get in the chair and walk around the room in the chair while he was still strapped in it with the tray. (Exhibit "H", Pgs. 65-66). Celli also claimed that D.B. would have an outburst and Wzorek, would have a hard time controlling him.(Exhibit "H", Pg. 67). Celli indicated that on the first occasion, bungee cords were utilized around D.B.'s legs, while on

5

the second occasion, Wzorek utilized the bungee cords around his legs and torso area. (Exhibit "H", Pg. 68).

Other than those two occasions, Celli never indicated that she saw Wzorek utilize bungee cords again.(Exhibit "H ", Pg. 69). Additionally, Celli indicated that she never informed anybody at the NEIU or at Abington Heights that Wzorek was utilizing bungee cords in 2001. (Exhibit "H", Pg. 71). When asked why she thought Wzorek, was utilizing bungee cords, Celli indicated that she did not know why she utilized the bungee cords and couldn't answer why she did it. (Exhibit "H", Pg. 72). Again, Celli never made mention of her concerns to any of the parents regarding the use of the bungee cords. (Exhibit "H", Pg. 72).

### *Testimony relating to the allegations on behalf of the minor Plaintiffs*

      i.    **Minor Plaintiff, B.M. -** When asked whether or not she ever saw B.M. strapped to a Rifton Chair with silver duct tape around his legs to the point where he was unable to move, Celli indicated that she did not see that. (Exhibit "H", Pg. 75). Celli further confirmed that she never remembered seeing duct tape being used with B.M. (Exhibit "H", Pg. 76). Plaintiffs' Second Amended Complaint alleges that B.M. was being deprived of his picture exchange system and Celli indicated that Wzorek took the picture exchange system away from B.M., which he utilized to go to the bathroom in an effort for him to learn how to sign how to go to the bathroom, because Wzorek felt that B.M. was abusing that system.  (Exhibit "H", Pgs. 77-78). At no time did Celli inform B.M.'s parents that Wzorek, was not using the picture exchange system for her son, however, she indicated that his parents were aware of the same. (Exhibit "H", Pg. 79).

Celli was asked about her knowledge regarding the allegations that Wzorek backhanded B.M. in the face causing blood to gush from his nose and lips to which Celli answered, "I can't say for sure

that I witnessed it." (Exhibit "H", Pg. 80). Celli was again asked whether or not she saw his nose and Wzorek's hand come into contact, to  which Celli responded, "No." (Exhibit "H", Pg. 81) While Celli did attempt to characterize what she did see, she admitted that she never made mention of that incident to B.M.'s parents.  (Exhibit "H", Pgs. 81-82).

Celli was also asked whether or not she ever witnessed Wzorek pinch B.M.'s arms to which she responded that she saw Wzorek squeeze children, however, she could not recall the first time when she witnessed the same. (Exhibit "H", Pgs. 82-83). She was also asked whether or not she witnessed Wzorek hit B.M., causing a cut on his face, to which she answered "No."(Exhibit "H", Pg. 86). Celli was also asked whether or not she ever saw Wzorek hit B.M., leaving a cut on his leg, to which she responded that she did not see it, however, she attempted to formulate her own reasoning as to what may have happened. (Exhibit "H", Pgs. 86-88). She admitted that she never saw Wzorek hit B.M., leaving a cut on his back.  (Exhibit "H", Pg. 88). When asked whether or not she had any conversations with B.M.'s mother  regarding what she had observed, Celli indicated that she could not answer whether she believed that something may have happened that was inappropriate. (Exhibit "H", Pg. 89).

Celli did indicate that Wzorek would step on the insteps of B.M., as well as other children, and stated that it was something that Wzorek did all the time to the students in the Rifton Chair, as they would be sitting there with their feet on the floor and she would come over to step on their insteps if they crying or if they were not doing their work, or were not eating. (Exhibit "H", Pg. 90). When asked whether or not she told anybody about Wzorek's stepping on students' insteps, Celli indicated that she was not sure if she told anybody. (Exhibit "H", Pg. 91). Celli also indicated that at no point in time did she ever tell Wzorek to stop stepping on students' insteps. (Exhibit "H", Pg.

92). Finally, Celli indicated that at no time did she recall ever having conversations with B.M.'s mother wherein she discussed concerns over Wzorek's behavior in 2001, or concerns over her behavior toward B.M. (Exhibit "H", Pgs. 93-94).

       **ii.**    **Minor Plaintiff, P.D.** - Despite the allegations made in P.D.'s Second Amended Complaint, Celli indicated that she never saw Wzorek utilize Tabasco Sauce on his fingers to prevent him from putting them in his mouth. (Exhibit "H", Pg. 94). When asked whether or not she recalled Wzorek screaming in P.D.'s face, Celli indicated that she did when P.D. would not want to do something and sit there and daze off and Wzorek would get in his face to the point where P.D. would cry. (Exhibit "H", Pg. 94). When asked whether or not Wzorek was yelling at P.D. in order to promote the educational process, Celli indicated " I don't know what she was thinking." (Exhibit "H", Pg. 95). When asked whether or not it was an intimidation factor to P.D., Celli indicated that she felt that there may be some intimidation for him to do his work, however, at no time, did she inform P.D.'s parents that she felt that Wzorek was intimidating their son. (Exhibit "H", Pgs. 95-96). When asked whether or not she ever recalled Wzorek pinching P.D.'s cheeks, leaving them red, Celli indicated that she did not recall it. (Exhibit "H", Pg. 96). When asked whether or not she recalled Wzorek, sending P.D. home with bruises on his body, Celli indicated that she did not remember it. (Exhibit "H", Pgs. 96-97).

       **iii.**    **Minor Plaintiff, D.B.** - When asked about the allegations that D.B. was dragged around the room by his broken arm, Celli indicated that she did not recall seeing the same. (Exhibit "H", Pg. 97). She did indicate that she saw Wzorek grab D.B. by his hair and drag him across the floor of the room, however, she did not recall specifically when that took place. (Exhibit "H", Pgs. 97-98). Celli did indicate that Wzorek pulled and squeezed D.B.'s arms as well as

stomping on him insteps.  (Exhibit "H", Pgs. 98-99). She indicated that a majority of the stomping of the feet was done when the children were in the Rifton Chairs.  (Exhibit "H", Pg. 100). She indicated that she could not think of an occasion where she saw Wzorek, pinch D.B.'s hands. (Exhibit "H", Pg.100). She did indicate that she recalled seeing D.B. on the floor after tipping the Rifton Chair. (Exhibit "H", Pgs.100-101). She indicated that Wzorek would leave D.B. in the Rifton Chair while he was crying and then she would lift him up. Despite all of the above allegations of abuse, Celli indicated that even though she personally knew D.B's mother, Eva L., and that she actually babysat D.B. while he was in Wzorek's class; at no time did she ever inform Eva L. that she had any concerns regarding Wzorek's behavior. (Exhibit "H", Pgs. 102-103).

      **iv.**     **Minor Plaintiff, R.R.** - Celli indicated that she recalled that Wzorek would make R.R. sit by herself and eat alone during lunch or withhold food as punishment for acting up. (Exhibit "H", Pg. 103). She indicated that R.R., would like to take somebody else's lunch or food snack and steal food from other students and that this made Wzorek mad. (Exhibit "H", Pg. 104). Wzorek could not stop R.R. from doing that so she made R.R. eat at a table by herself so that she could not eat the food of other children. (Exhibit "H", Pg. 104).

      With regard to the allegations that Wzorek struck R.R. with a backhand type blow, Celli indicated that she did not see it. (Exhibit "H", Pg. 104-105). She acknowledged that Wzorek would scream at R.R.'s face, telling her to do her work and if the kids did not do their work, that they were going to be hers. (Exhibit "H", Pg. 105).

      When asked whether or not she saw Wzorek, squeeze and crush R.R.'s fingers, Celli indicated that she didn't see the actual crushing, however, she heard R.R. indicate that Miss Sue crushes her fingers.  (Exhibit "H", Pgs. 105-106). Celli also indicated that she saw Wzorek step on

R.R.'s insteps while she was in the Rifton Chair. (Exhibit "H", Pg. 106).

**v.     Minor Plaintiff, J.M.G.** - Celli indicated that she recalled seeing Wzorek, squeeze J.M.G.'s ears. (Exhibit "H", Pg. 107). She indicated that she would do this when J.M.G. would not do his work. (Exhibit "H", Pg. 107). She indicated that she saw Wzorek grab J.M.G.'s neck violently on about two or three occasions, however, she did not feel it appropriate to inform J.M.G.'s parents of the same. (Exhibit "H", Pgs.119-120). While it was alleged in the Second Amended Complaint, Celli never saw Wzorek force J.M.G. to the floor, and never saw her hit J.M.G. in the legs and head with a tissue box.  (Exhibit "H", Pg. 120). Celli indicated that she saw Wzorek pull his hair on a few occasions.  (Exhibit "H", Pgs. 120-121). She denied ever seeing Wzorek verbally abuse J.M.G. (Exhibit "H", Pg. 106).

**vi.    Minor Plaintiff, A.J.M.** - While it is alleged in the Second Amended Complaint, Celli indicated she never recalled seeing Wzorek strike A.J.M. on the legs or arms causing bruising. (Exhibit "H", Pgs. 121-123).  She did see Wzorek scream in A.J.M.'s face if he was not doing his work or eating his lunch. (Exhibit "H", Pg. 123).

Celli indicated she never saw Wzorek squeeze A.J.M.'s arms, but did see her step on his insteps. (Exhibit "H", Pg. 124). She indicated that A.J.M. would spend a lot of time in the Rifton Chair, not because it was a behavior thing, but because he liked to be in there and liked to do puzzles while sitting in the Rifton Chair. (Exhibit "H", Pg. 124).  If he wasn't doing what he was supposed to be doing, she indicated that Wzorek, would step on his insteps. (Exhibit "H", Pg. 124).

**vii.   Minor Plaintiff, J.B.** - Celli indicated that she recalled Wzorek squeezing J.B.'s ears somewhere between five and ten times during the school years in question. (Exhibit "H", Pg. 125). She indicated there was a time when J.B. was doing his work when his pieces fell onto the

floor. She claimed that Wzorek got him from the back of the neck and held his neck until he got down on the floor making him pick up the pieces and then she let him get back up.  (Exhibit "H", Pg. 126). She never informed J.B.'s mother about this incident. (Exhibit "H", Pg. 126). Other than on that one occasion, Celli indicated that she never recalled Wzorek forcing J.B. to the floor. (Exhibit "H", Pg. 129).

When asked whether or not she witnessed Wzorek force J.B. to undress himself in front of her, Celli indicated that she did not see this event. (Exhibit "H", Pg. 129). Finally, when asked whether or not she recalled Wzorek verbally abusing J.B., Celli indicated that she couldn't say verbal abuse but she did feel it was intimidating . (Exhibit "H", Pg. 131).  She clarified that to say that Wzorek did not do anything degrading to him or verbally abuse him. (Exhibit "H", Pg. 131).

**B.    Testimony of Robin Medeiros -** Robin Medeiros, hereinafter referred to as "Medeiros" was a teacher's aide for Wzorek in the autistic support classroom for both the 2001-2002, 2002-2003 school years and her deposition is attached hereto and marked as Exhibit "I". Medeiros indicated that in December of 2002, she recalled an incident where Wzorek hit R.R. in her mouth with the back of her hand causing a fat lip for R.R.. (Exhibit "I", Pg. 22). She was unable to describe the force that was used. (Exhibit "I", Pg. 23). She did indicate that after that incident, Wzorek called R.R.'s mother to inform her what had happened. (Exhibit "I", Pg. 24). She never questioned Wzorek about what she witnessed, nor did she ever go to any NEIU supervisor or anyone else including R.R.'s parents to inform them of what she witnessed.  (Exhibit "I", Pgs. 25-26).

Medeiros also indicated she saw Wzorek drag D.B. across the floor by his arms to put him into a Rifton Chair. (Exhibit "I", Pg. 27).

Medeiros also indicated that she recalled an incident in 2001 that occurred with duct tape

11

involving *T.J.N.*. Medeiros indicated that Wzorek duct taped that student across his feet and mid-section, while he was in the Rifton Chair. (Exhibit "I", Pg. 33). Medeiros indicated that Wzorek indicated that it was acceptable to use duct tape because she learned it at a seminar. (Exhibit "I", Pg. 34). Medeiros indicated that other adults in the classroom who observed the duct tape were Sue Collins, Meredith Jackson, Cathy Smith, Jill Celli, and Cathy Healey. (Exhibit "I", Pg. 35). Medeiros indicated that she was the only one who ever questioned the use of the duct tape and that she accepted Wzorek's response. (Exhibit "I", Pgs. 34-36).

Medeiros also indicated that WZOREK and Meredith Jackson brought in bungee cords and that Wzorek used the bungee cords on a couple of the kids on two different occasions. (Exhibit "I", Pgs. 36-37). Medeiros indicated that Wzorek's use of the duct tape and bungee cords was done in a manner in which Wzorek was trained. (Exhibit "I", Pg. 39). Medeiros also indicated that she originally thought that the use of the Rifton Chair was an acceptable form for punishment and that she would, at times, put students in the Rifton Chair. (Exhibit "I", Pgs. 40-41). She also acknowledged that the Rifton Chairs were used at times for the children so that they could do their work. (Exhibit "I", Pgs. 42-43).

### *Testimony relating to the allegations on behalf of the minor Plaintiffs*

  **i.** **Minor Plaintiff, B.M.** - Medeiros indicated she never witnessed B.M. being duct taped to a chair. (Exhibit "I", Pg. 44). She also indicated she believed that B.M. was being deprived of his picture exchange system, however, she could not indicate when that was. (Exhibit "I", Pgs. 44-45). Although it was alleged in the Second Amended Complaint, Medeiros indicated that she never saw Wzorek backhand B.M. in the face, causing blood to gush from his nose and lips.(Exhibit "I", Pg. 46). She also never witnessed Wzorek pinch him, leaving bruises on his arms,

hitting him leaving cuts on his face, or hitting him leaving cuts on his legs, back or pelvis. (Exhibit "I", Pg. 46). She recalled Wzorek stepping on his insteps because at times when the children were in the Rifton Chair, they kicked their feet or they were acting up while they were in the chair, and Wzorek would go over and step on their feet to prevent them from moving their feet. (Exhibit "I", Pgs. 46-47).

   **ii.**  **Minor Plaintiff, P.D.** - Again, although it is alleged in the Second Amended Complaint, Medeiros indicated that she never saw Wzorek use Tobasco Sauce with any student including P.D. (Exhibit "I", Pg. 48). She did indicate that Wzorek would scream in his face if he did something wrong. (Exhibit "I", Pg. 49). Screaming consisted of anything from telling them to finish their work or to be quiet. (Exhibit "I", Pg. 49). Additionally, although it is alleged in the Second Amended Complaint, Medeiros indicated she never saw Wzorek pinch P.D.'s cheeks leaving them red. (Exhibit "I", Pg. 51). She never saw an incident where Wzorek sent him home with stretched clothing or that she placed any bruises on his body. (Exhibit "I", Pg. 52).

   **iii.**  **Minor Plaintiff, D.B.** - Medeiros indicated that she never saw Wzorek drag D.B. by his broken arm, however she did see her dragging him across the floor by his arm and his hair. (Exhibit "I", Pg. 52). Medeiros indicated that this only happened on one occasion and that she had no idea what kind of force Wzorek was using to get the children into those chairs. (Exhibit "I", Pgs. 52-53). Medeiros did indicate however, that the force that Wzorek was using was sometimes appropriate, however, sometimes she felt that it was not appropriate. (Exhibit "I", Pg. 53). Medeiros indicated that she didn't think at the time that Wzorek was using too much force, however, when she looks back on it now, she claims that the force may have been too much. (Exhibit "I", Pg. 54).

   Medeiros indicated she never saw Wzorek pinch D.B.'s hands or arms. (Exhibit "I", Pg. 56).

She also indicated that Wzorek did not pinch his ears, however, she would grab his ears at times. (Exhibit "I", Pg. 56). Medeiros never told anybody that the behavior she witnessed from Wzorek was inappropriate. (Exhibit "I", Pgs. 56-57). Medeiros also indicated that at no point in time did she ever go to the parents of the students that she believed were being abused at the time the alleged abuse was occurring. (Exhibit "I", Pgs. 58-59).

Medeiros indicated that she never saw Wzorek force D.B. to stay on the floor despite the same being alleged in the Second Amended Complaint.(Exhibit "I", Pgs. 59-60). She never saw Wzorek use duct tape on D.B. (Exhibit "I", Pg. 60).

**iv.    Minor Plaintiff, R.R.** - Medeiros indicated she recalled Wzorek, screaming in R.R.'s face, however, she could not give specifics. (Exhibit "I", Pgs. 60-61). She recalled seeing Wzorek grab R.R.'s hands, however she did not know that there was any crushing or squeezing of the fingers going on at that time.  (Exhibit "I", Pg. 61). She did recall Wzorek stamping on R.R.'s insteps. (Exhibit "I", Pg. 61). She also acknowledged that she was strapped into the Rifton Chair and further clarified that in order to keep a child in that chair, they have to either be strapped or the tray had to be put on.  (Exhibit "I", Pgs. 61-62).

**v.    Minor Plaintiff, J.M.G.** - Medeiros indicated she never recalled seeing Wzorek squeeze J.M.G.'s ears, never saw Wzorek step on his insteps, never saw her grab his neck violently or force him to the floor. (Exhibit "I", Pg. 62). She did recall seeing Wzorek hit J.M.G. in the head with a tissue box on one occasion, however, she did not recall Wzorek pulling his hair. (Exhibit "I", Pgs.62-63). She did acknowledge that Wzorek would scream in his face, however, she could not give any specific instances. (Exhibit "I", Pg. 63).

**vi.    Minor Plaintiff, A.J.M.** - With regard to the allegations in the Second

14

Amended Complaint, Medeiros indicated that she did not recall Wzorek striking A.J.M. on the legs and arms. (Exhibit "I", Pgs. 63-64). She acknowledged Wzorek would scream in his face, however, she could not give specifics. (Exhibit "I", Pg. 64). Medeiros also did not recall any incident where Wzorek would squeeze and crush the arms or stomp on A.J.M's insteps. (Exhibit "I", Pg. 64).

**vii.    Minor Plaintiff, J.B.** - Medeiros indicated that J.B. was restrained in a Rifton Chair for discipline and that Wzorek would squeeze his ears in a manner that was inappropriate. (Exhibit "I", Pgs. 64-65). She never informed anybody that this behavior was inappropriate. (Exhibit "I", Pg. 65). She also acknowledged that Wzorek would step on his insteps, however, she could not clarify when this would occur. (Exhibit "I", Pg. 65). Medeiros also indicated she never saw Wzorek, force J.B. down to the floor and never saw her force him to undress in front of her. (Exhibit "I", Pgs. 73-74). She did see Wzorek verbally abuse and grab him by the back of the neck and refusing a snack for him at snack time as a form of punishment. (Exhibit "I", Pgs. 74-75).

**C.    Testimony of Kathy Smith (now Kathy Pierce) -** Kathy Smith, hereinafter referred to as "Smith" was a TSS worker, working in Wzorek's autistic support classroom for the 2001-2002 and 2002-2003 school year. A copy of her deposition transcript is attached hereto and marked as Exhibit "J". With respect to the allegations of abuse for the individual students, Smith indicated that she saw Wzorek utilize bungee cords on either one or two occasions on a student *T.J.N.* because that child was becoming a danger to himself and to others in the classroom.(Exhibit "J", Pg.16). She indicated that Wzorek utilized the bungee cords because the student would stand up and go after whoever was closest to him, to either hit, kick, throw, or spit. (Exhibit "J", Pgs. 17-18). She indicated that Wzorek was utilizing the bungee cords with that student to prevent him from harming himself or others. (Exhibit "J", Pg.18).

15

When asked whether or not Wzorek ever utilized duct tape, it was indicated that she had a vague recollection of the use of duct tape but she could not recall any child with whom she utilized the duct tape. (Exhibit "J", Pgs. 19, 52-53). Smith indicated that during the 2001-2002 class year, she noticed Wzorek becoming more aggressive with the students. (Exhibit "J", Pg.19). When asked if she thought it was inappropriate, Smith indicated that she didn't because during the first month it was chaotic in the room and her concern was with her client, and when you have five year olds and eleven year olds in the same classroom, who have pretty severe behavioral problems, she wanted to make sure that her client (minor Plaintiff A.J.M.) was out of harms way. (Exhibit "J", Pg.20).

With respect to allegations that Wzorek left D.B. tipped over on the floor in a Rifton Chair, Smith indicated that she could not specifically recall Wzorek instructing anybody to leave him on the floor when he tipped the chair on its side. (Exhibit "J", Pg. 23).

When questioned about a statement she gave indicating that she did not witness Wzorek being physical with the students, Smith indicated that it was accurate. (Exhibit "J", Pgs. 23, 75-77). She did, however, indicate that she witnessed Wzorek grab a student by the ear, however, she was not sure when it had occurred. (Exhibit "J", Pg.23).

The only individual that Smith complained to was her Supervisor, Margie Cosgrove, who was employed by Tri County Human Services. (Exhibit "J", Pg.25). Smith indicated that Wzorek was under a lot of stress and that her Supervisor, based upon what Smith told her, asked Smith to offer more assistance in the classroom. (Exhibit "J", Pgs. 25-26).

Smith also indicated that other instances of more aggressive behavior on behalf of Wzorek included grabbing J.B. by the back of the neck instead of the ear to lead him, or by the back of the shirt which she also did with A.J.M. (Exhibit "J", Pg.26). She indicated that while this did happen,

it did not happen often, but that Wzorek would also grab student's faces to get them to do the work when they refused to do any type of work. (Exhibit "J", Pg.27).

Smith indicated that she believes that she may have seen Wzorek backhand R.R. in the mouth, however, Wzorek indicated that it was an accident and Smith accepted what she saw and Wzorek's characterization of it as an accident at the time. (Exhibit "J", Pgs. 27-28). Additionally, when asked whether or not she felt that when Wzorek would grab A.J.M's face, was inappropriate, Smith indicated that she did not feel it was inappropriate. (Exhibit "J", Pg.28).

Smith indicated that she was the TSS worker working with A.J.M., during the 2001-2002 school year. (Exhibit "J", Pg.29). When asked whether or not she ever had occasion to speak to A.J.M's parents, Smith indicated "No", because there was nothing that happened with him that first year. (Exhibit "J", Pg.29). She also could not remember having any discussions with A.J.M.'s parents during the 2002-2003 school year regarding Wzorek's behavior. (Exhibit "J", Pgs. 29-30). She also was a TSS worker for J.M.G. during the 2002-2003 school year and again, had no conversations with his parents regarding Wzorek's conduct and treatment toward their son for that year. (Exhibit "J", Pg.30).

Smith was asked about the use of the bungee cords on student, *T.J.N.*. Smith indicated that when the bungee cords were used, they were found not to work for the purpose for which they were intended and they were not used anymore after that. (Exhibit "J", Pg.33).

Smith indicated that she believed that Wzorek was a wonderful teacher. (Exhibit "J", Pg.35). She indicated that despite the fact that she informed her Supervisor as well as possibly somebody else of what was transforming in Wzorek's classroom; she was never told by her Supervisor or anyone else to report Wzorek's actions to the NEIU, Abington Heights, or other authorities. (Exhibit

"J", Pgs. 38-39). Smith also clarified that she recalled instances of Wzorek stomping on children's feet, to which she indicated that Wzorek was not stomping on their feet just stepping on their feet for purposes of stopping them from kicking. (Exhibit "J", Pgs. 63-64).

**D.     Testimony of Meredith Jackson** - Meredith Jackson was identified as a TSS worker for B.M., and J.B., during the 2001-2002, school year.  A copy of her deposition transcript is attached hereto and marked as Exhibit "K". Jackson indicated the first thing that she noticed about Wzorek's behavior being inappropriate was the use of Rifton Chairs as a time out or for punishment. (Exhibit "K", Pg.12). As it pertains to J.B., she indicated that Wzorek would use the Rifton Chair to keep him contained so that he would eat his food in one place as the Rifton Chair would have a slide tray on it. (Exhibit "K", Pg.13). She also indicated that Wzorek would, at times, be very "hands on" with the children and she would apply deep pressure to them.  (Exhibit "K", Pg.14). Jackson said that Wzorek informed her that the deep pressure would relax him. (Exhibit "K", Pg.18).  Jackson also indicated that she was aware that of the bungee cord incident where Wzorek utilized bungee cords around D.B., however, Jackson indicated that it didn't work and he was out of the bungee cords within a matter of seconds.(Exhibit "K", Pg.15-16).  Jackson indicated that she only saw the use of bungee cords on one occasion and that "the feeling in the room was that it didn't work, so lets not do it again." (Exhibit "K", Pg.17).

When asked whether or not there was any other behavior that she witnessed on behalf of Wzorek that she felt was inappropriate, Jackson indicated that she felt Wzorek would speak loudly and get into the face of the students and was very firm to them. (Exhibit "K", Pgs. 20-21). She further stated that Wzorek would put her hands on their hands to get their attention and she would also step on their toes so that students would look at her to get her attention one on one. Exhibit "K",

Pg.21). Jackson indicated that she had no reason not to trust Wzorek's teaching methods and that she relied upon her extensive years of teaching. (Exhibit "K", Pgs. 21-22).

Jackson indicated that she never saw Wzorek strike a child.  (Exhibit "K", Pg.26).  She also indicated that she never saw Wzorek drag a child, however, she did  see Wzorek, sit on B.M. when he would become upset and start to act up so she could gain control.  (Exhibit "K", Pg.26). Jackson indicated that Wzorek realized that B.M. was too big for the Rifton Chair so she would ask the Aides to assist in holding him down so that he could calm down. (Exhibit "K", Pg.26).  Jackson believed that Wzorek sat on B.M. on three or four occasions.  (Exhibit "K", Pg. 27).  Jackson also indicated that Wzorek believed that B.M. was abusing his bathroom privileges and that she had taken his PECS Board away from him for that purpose. (Exhibit "K", Pgs. 27-28).  She did, however, indicate that he learned how to sign the request to go to the bathroom and that was utilized with Ms. Jackson. (Exhibit "K", Pg. 28).

With respect to the allegations regarding the bungee cords, Jackson indicated that it was her understanding that the bungee cords were used by Wzorek to keep D.B.  from destroying or pulling things down or kicking things or hurting himself.  (Exhibit "K", Pgs. 30-31).

As it pertained to the deep pressure that Wzorek utilized on B.M., she indicated that he was already uncomfortable and that Wzorek thought it would calm him down, however, Jackson did not agree with that thought process because it was not a massage and it appeared to be pushing down and applying pressure but did not involve any pinching.  (Exhibit "K", Pgs. 31-32).  Additionally, Jackson indicated that B.M.'s parents knew he was being placed in a Rifton Chair during the time that he was in Wzorek's classroom. (Exhibit "K", Pg. 41). She also acknowledged that there were times that he would become agitated and drop to his knees and jump from the table onto his knees

grabbing his chest and trying to tackle people or throw things around the room which would cause bruising on his own. (Exhibit "K", Pg.42).

Jackson testified that while she was taught not to put hands on children, you can not go through a day without touching a child when they are aggressive. (Exhibit "K", Pg.44). She indicated that there was no way that she or anyone else in the classroom could have used a basket hold upon B.M. because he was way to big for any of the teachers and it would not work because the hold could not be administered correctly upon him. (Exhibit "K", Pgs. 45-46). When asked whether or not she ever had occasion to express concern or worry about B.M.'s safety, Jackson indicated that she expressed concerns over the way the Rifton Chair was being used, however she did not recall ever stating that she had reasons to worry about his safety or the safety of any of the other students. (Exhibit "K", Pg.47).

**E.      Testimony of Defendant, Susan Wzorek** - The Deposition of Susan Wzorek is attached hereto and marked as Exhibit "L." The initial line of questioning posed to Wzorek asked her for what purpose, or for what reason she allegedly performed what Plaintiffs' counsel characterized as "torture" on the children. Wzorek indicated that she did not perform torture on any children. (Exhibit "L", Pgs.8-10). Wzorek also denied causing harm to any of the students at the Abington Heights School District between the years 2001 - 2003. (Exhibit "L" Pg.14).

Wzorek was asked about the use of bungee cords with D.B. to which she indicated that she did not trap him in a chair with bungee cords, but rather she assisted a TSS worker in containing D.B. to the chair because he was flipping it over and she was afraid of him becoming injured by flipping the chair backward. (Exhibit "L", Pgs.23-25). Wzorek also indicated that it was their intention of using the bungee cords so that D.B. would not get harmed. (Exhibit "L", Pg.28).

Wzorek was also asked about whether or not she utilized the Rifton chair as a form of punishment of any child. (Exhibit "L", Pg.27). Wzorek also acknowledged that many of the students in her classroom had extreme behavioral problems. (Exhibit "L", Pg.37). By putting D.B. into the Rifton chair and utilizing bungee cords, Wzorek indicated that they were trying to stop a behavior because they were afraid he was going to injure himself or another student due to the fact that they had 5-year olds in the classroom and there was a fear that he would flip himself or equipment around injuring some of those 5-year old students. (Exhibit "L", Pg. 38). Wzorek also denied the allegations that she dragged D.B. across the floor, strapping him into the Rifton chair. (Exhibit "L", Pgs.38-39).

Wzorek denied utilizing duct tape on any child in the classroom. (Exhibit "L", Pgs.39, 166 - 168). Wzorek did clarify other purposes for the Rifton chair which included educational purposes because those chairs were useful in that they had two sides on them and you could pull up to a table and a child would be closed in somewhat and it was easier for the teachers and the aides to work with them. (Exhibit "L", Pg. 41).

Despite the allegations made on behalf of D.B., Wzorek specifically denied dragging him across the room by his arm, dragging him across the room by his hair, pulling and squeezing his arms, stomping on his insteps, pinching his hands and arms, pinching and bruising his ears, dragging him across the room by his ears, forcing him to stay on the floor, or strapping him to a Rifton chair with bungee cords making him unable to move as a form of punishment. (Exhibit "L", Pgs. 57-59).

Wzorek was also asked about an incident regarding J.B. wherein it was alleged that she made him undress himself and change himself. Wzorek testified that J.B. was able to pull his pants down and pull his pants back up and that she changed his diapers many, many times. (Exhibit "L", Pgs. 85-87). She denied any incident wherein she told either Celli or Mederios not to change J.B.

21

(Exhibit "L", Pg.87).  Wzorek was also asked about an incident with A.J.M. wherein it was alleged that she allowed him to be transported home with his clothes soaking wet due to the fact that he had gone to the bathroom in them.  Wzorek indicated that many times A.J.M. would have accidents on his van because his commute was an hour long and many times they put a plastic bag underneath him due to that condition. (Exhibit "L". Pgs. 89 - 91).

Wzorek denies ever threatening to use or utilizing tabasco sauce on P.D.'s fingers. (Exhibit "L", Pgs. 92-93).  She also denied pinching, P.D.'s cheeks and sending him home with stretched clothes and bruises on his body. (Exhibit "L", Pgs. 93-94).  Wzorek also denied ever strapping P.D. into the Rifton chair because he loved being in the Rifton chair, and while utilizing it, there would be no need to strap him into it. (Exhibit "L", Pgs.94-95).

As it pertains to B.M., Wzorek denied the allegations made against her that she backhanded him in the face causing blood to gush from his nose, pinching and leaving finger marks and bruises on his arms and shoulders, hitting him leaving cuts on his face, legs, back, and pelvis or stepping on his insteps causing bruises on the top of his feet. (Exhibit "L", Pgs. 95-97).

With respect to the allegations made on behalf of A.J.M., Wzorek denied striking him on the legs and causing bruising and stomping on his insteps. (Exhibit "L". Pg. 97).  As it pertains to the allegations made on behalf of R.R. with respect to the alleged abuse at the hands of Wzorek; Wzorek denied backhanding her in the face causing her to bleed and further described the incident for which she believes these allegations are based upon as one in where R.R. jumped up and caught Wzorek's ring with her lip. (Exhibit "L", Pg. 98).  Wzorek testified that she then called her mother right away and explained what had happened and even further clarified that Celli happened to be sitting next to her and that she witnessed the entire thing and actually noted in the notebook that it was an

22

accident. (Exhibit "L", Pg. 98). Wzorek also denied hitting R.R., squeezing and crushing her fingers or stomping on her insteps. (Exhibit "L", Pgs.100-101). As it pertained to R.R., and any time that she spent in the Rifton chair, Wzorek testified that she did a lot of work when she was in the chair and that chair enabled her to calm down. (Exhibit "L", Pgs.101-102).

There are numerous allegations made on behalf of the minor Plaintiffs that Wzorek screamed into the faces of the minor Plaintiffs while they were in the classroom. Wzorek testified that she used voice control to try to control the children. (Exhibit "L", Pg. 102). Wzorek denied screaming into the faces of the children but indicated there may have been instances wherein she would have screamed at the aides, namely Celli and Mederios, due to the frustration that she had with them and the ongoing tensions in that classroom. (Exhibit "L", Pgs.102-106).

With respect to allegations regarding J.M.G., Wzorek described him as a gentle child and denied the allegations that she squeezed his ears, stepped on his insteps, forced him to the floor, hit him in the legs or head with a tissue box, pulled his hair, or verbally abused him. (Exhibit "L", Pgs. 107 - 108).

Wzorek indicated that she had nothing to do with the installation of Rifton chairs in her classroom and indicated that after she had a meeting with Tom Nasser, her supervisor at the time, after an incident with B.M. It was a recommendation that a Rifton chair be brought into the classroom and Wzorek further testified that B.M.'s parents were present at that meeting and knew that a Rifton chair was recommended and subsequently brought into the classroom. (Exhibit "L", Pg. 157). Wzorek was asked about B.M.'s parents questioning her regarding bruises on his body. Wzorek indicated that she recalled being questioned by his parents and stated that B.M. had a TSS worker assigned to him, Meredith Jackson, and that occasionally, B.M. would go off and stand on

23

the top of the table and come down on his kneecaps and they were trying to keep him under control that day. (Exhibit "L", Pgs.158-159). Wzorek testified that it was Meredith Jackson who corresponded with B.M.'s parents regarding those incidents. (Exhibit "L", Pg.159). Wzorek indicated that she may have had direct communications with B.M.'s parents that day informing them that he had been jumping off the table and being very aggressive toward the other students. (Exhibit "L", Pgs. 159 - 160).

Wzorek again clarified her testimony indicating that when she used bungee cords with D.B. it was for a safety measure. (Exhibit "L", Pgs. 164- 165). Her purpose of attaching the bungee cord from one leg of the chair to the other leg of the chair was to secure him because D.B. was getting leverage pushing the chair over and she was afraid that he would break his neck because he was kicking and hitting her and Cathy Smith. (Exhibit "L", Pg. 166). Wzorek also clarified that again, at no time was duct tape used on any child. (Exhibit "L", Pgs. 166 - 167).

F.    **First Notice of Allegations of Abuse** - Wzorek testified that she first became aware that Celli and Medeiros were bringing allegations of abuse by her against the children in July of 2003. (Exhibit "L", Pgs.142-143). She was informed by Clarence Lamanna and Fred Rossetti that there were charges of pushing and pulling, and yelling at students made by Celli and Medeiros. (Exhibit "L", Pgs.143-144).

When asked why she felt that Celli and Medeiros had reported her actions as being abusive toward the children in the classroom, Wzorek indicated that in June of the end of the second year, she had enough of Celli and Medeiros in the classroom and felt they were a very negative influence on the students. (Exhibit "L", Pg. 169). She wrote Medeiros a letter requesting that she post out of her classroom in September for the next year. (Exhibit "L", Pg. 169). Wzorek claimed that after she

wrote the letter to Medeiros, they went into the office and reported her. (A copy of the letter sent by Wzorek to Medeiros is attached hereto and marked as Exhibit "M").

Wzorek indicated that at no time did Celli or Medeiros ever express any objection to the use of the bungee cord while they were aides in her class. (Exhibit "L", Pg.170). When asked as to whether or not Celli or Medeiros ever objected to any of her treatment or techniques on any of the kids in the classroom, Wzorek indicated that there was a meeting in March that she had with her aides, noting that they were very negative in the classroom and negative towards the students. (Exhibit "L", Pg.171). She also indicated that her supervisor, Bob Weir, came into her classroom in May of 2003 and did an evaluation. (Exhibit "L", Pg. 172). Wzorek told Weir that there were some negatives in the classroom and that Celli and Mederios had a problem with their classroom times. (Exhibit "L", Pgs. 172 -173). Wzorek also indicated that Weir asked Celli and Medeiros if they had any problems with Wzorek, to which they responded that they did not. (Exhibit "L", Pg.173).

Wzorek believed that since she wrote that letter to Medeiros about the negativity in the classroom, Celli and Medeiros became vindictive and retaliated against her by bringing false accusations of abuse. (Exhibit "L", Pgs.174-175). In fact, Medeiros even testified that if she did not receive the letter and had a subsequent phone call with Wzorek, she probably would not have gone to Dr. Lamanna. (Exhibit "I", Pg. 96). Medeiros also admitted that she did not meet with Bob Weir, the NEIU supervisor at the time, to discuss any of the allegations of abuse with Sue Wzorek. (Exhibit "I", Pg. 95).

III.    STATEMENT OF QUESTIONS INVOLVED

   A.    Is Defendant Wzorek entitled to Qualified Immunity since Plaintiffs have failed to establish that her actions violated a clearly established constitutional right or that an objectively reasonable person would know that her actions violated such

constitutional rights?

**SUGGESTED ANSWER**: *In the affirmative*.


**B.**     Is Defendant Wzorek entitled to summary judgment as a matter of law as it pertains to Plaintiffs' substantive due process claims since Plaintiffs have failed to establish that Wzorek's conduct was "shocking to the conscience" or that she discriminated against the autistic children in her class by inflicting physical and emotional abuse upon them?

**SUGGESTED ANSWER**: *In the affirmative*.

**C.**     Is Defendant Wzorek entitled to summary judgment as a matter of law on Plaintiffs' claim for violations of the IDEA since liability under the IDEA does not extend to individual actors such as Wzorek?

**SUGGESTED ANSWER**: *In the affirmative*.


**D.**     Is Defendant Wzorek entitled to summary judgment as a matter of law on Plaintiffs' state law claims of assault and battery since Plaintiffs have failed to establish that her conduct amounted to an attempt or intentional cause of bodily injury to another or that she acted with physical menace to put any of the autistic children in fear of imminent, serious bodily injury?


**SUGGESTED ANSWER**: *In the affirmative*.

**E.**     Is Defendant Wzorek entitled to summary judgment as a matter of law since Plaintiffs have failed to prove that her conduct was extreme and outrageous and that it was her intent to cause severe emotional distress?

**SUGGESTED ANSWER**: *In the affirmative*.


**F.**     Is Defendant entitled to summary judgment on Plaintiffs' claims for a breach of fiduciary duty since Plaintiffs have failed to establish that Wzorek abused her role as teacher to benefit in some way to the detriment of her students, or simply because the relationship between a teacher and student does not rise to the level of a fiduciary relationship recognized in accordance with the law?

**SUGGESTED ANSWER**: *In the affirmative*.

> **G.**    Should Plaintiffs claims for punitive damages be dismissed since Plaintiffs have failed to establish that the conduct of Defendant Wzorek was outrageous, the product of some evil motive or that she acted with intentional recklessness or malice?

**SUGGESTED ANSWER**: *In the affirmative*.

## IV.    ARGUMENT

*Standard of Review* - Federal Rule of Civil Procedure 56(c) requires the Court to render summary judgment "...forthwith if the pleadings, depositions, answers to Interrogatories, and admissions on file, together with the Affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "This standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported Motion for Summary Judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477, U.S. 242, 247- 48, 106 S.Ct. 2505, 91 L.Ed. 2d 202 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would effect the outcome of the case under applicable substantive law. Anderson, 477 U.S. 248; Gray v. York Newspapers, Inc., 957 F.2d. 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable Jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 257.

When determining whether there is an issue of material fact, the Court must view the facts and all reasonable inferences in favor of the moving party. Moore v. Tartler, 986 F.2d.., 682 (3d Cir. 1993); Clement v. Consolidated Rail Corporation , 963 F. 2d. 599, 600 (3d Cir. 1992); White v. Westinghouse Electric Company, 862 F.2d.. 56, 59 (3d  Cir. 1988). When opposing Summary

Judgment, however the non-moving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party seeking Summary Judgment satisfies its burden under Rule 56(c) of identifying evidence which demonstrates the absence of a genuine issue of material fact, the non-moving party is required by Rule 56(e) to go beyond the pleadings with Affidavits, depositions, answers to Interrogatories, or the like, in order to demonstrate specific material facts which give rise to a genuine issue. Celotex Corporation v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d. 265 (1986). The party opposing the Motion "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industrial Company v. Zenith Radio, 475, U.S. 574, 586, S Ct. 1348, 89 L Ed. 2d. 538 (1986). When Rule 56(e) ships the burden of production to the non-moving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for " a complete failure of proof concerning the essential element of the non-moving party's case necessarily renders all other facts immaterial". Celotex, 477 U.S. at 323.

    **A.**    **Qualified Immunity** - Wzorek asserts that qualified immunity should shield her from liability. Under the Doctrine of Qualified Immunity, the inquiry is divided into two separate issues. First, the Court must examine whether the conduct of the Defendant violated clearly established constitutional rights. Harlow v. Fitzgerald, 457 U.S. 800, 817-18 (1982). Next, the Court must address whether an objectively reasonable person in the Defendant's position would have known that their conduct would have violated such constitutional rights. Id. The analysis generally turns on the " 'Objective legal reasonableness' of the action...assessed in light of the legal rules that were 'clearly established' at the time it was taken." Anderson v. Creighton, 483 U.S. 635, 639 (1987) (quoting Harlow, 457 U.S. at  818-19) ( "Anderson II"). Qualified immunity is applicable even

where officials "of reasonable competence could disagree" that such acts were objectively reasonable, see Malley v. Briggs, 475 U.S. 335, 341 (1986) and "as the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who normally violate the law". Id.

The determination of qualified immunity upon a Motion for Summary Judgment is entirely appropriate. Harlow, 457 U.S. at 818; Grant v. City of Pittsburgh, 98 F.3d 116, 122, (3d Cir. 1996). The first issue, whether a Plaintiff asserts the violation of a clearly established constitutional right, is purely a question of law. Sharrar v. Felsang, 128 F.3d 810, 828 (3d Cir. 1997). The second issue, whether the officer reasonably believed in the lawfulness of his or her conduct, is also generally an issue of law to be decided by the court. Id.

The threshold question for the court is whether the constitutional rights asserted by Plaintiffs are clearly established at the time Defendant acted. Siegert v. Gilley, 500 U.S. 226, 232 (1991). Only if this question is answered affirmatively, may this Court move on to the analysis of whether the Defendant's conduct was objectively reasonable. Johnson v. Horn, 150 F.3d 276, 286 n. 7(3d Cir. 1998).

The Supreme Court has explained what it means by clearly established rights for the purposes of qualified immunity by stating "the contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say...the unlawfulness must be apparent. Anderson, 483 U.S. at 640. In determining whether Defendant's conduct impinged upon clearly established constitutional rights, the Courts are required to conduct more than a generalized inquiry into whether an abstract

constitutional right is implicated. Id. at 639-40. Moreover, the Third circuit has similarly held that when there is a lack of substantially similar authority on point, the law can not be said to be clearly established. Sharrar, 128 F.3d at 810, 828-29; Johnson, 150 F.3d at 286; Pro v Donatucci, 81 F.3d 1283, 1292 (3d Cir. 1996). If the actions of the government official, as alleged by the Plaintiff, do not even rise to a level of constitutional violation, then that official is clearly entitled to qualified immunity. City of Philadelphia Litigation v. City of Philadelphia, 150 F.3d 711, C.A. 3 (Pa.), Sept. 09, 1998 (No. 96-2127).

In the present cases before the court, Plaintiffs have failed to establish that Wzorek violated any clearly established constitutional rights of the Plaintiffs based upon the conduct which they claim gives rise to their complaints. Wzorek was asked specifically about the allegations raised in Plaintiffs' Complaint which Plaintiffs characterize as abusive conduct to the minor Plaintiffs. Nowhere on the record has it been established that Wzorek felt her conduct or treatment of the students was , in effect, depriving them of their constitutional rights.  In fact, at no time during the two years as teacher in that classroom was it brought to her attention that any of the other adults  in the classroom or parents of the minor children believed that her teaching methods were being conducted in a manner that could reasonably be construed as depriving the minor Plaintiffs' rights.

Plaintiffs have not established that the conduct alleged against Wzorek was for purposes of depriving any of the minor Plaintiffs of their constitutional rights. Moreover, the record supports that at the time that Wzorek acted, nobody within her classroom felt that the conduct was significant to report her conduct to any of her supervisors or any authorities outside of the classroom. As such, Wzorek's attempt to teach, educate, redirect, and/or discipline the autistic children in the manners as testified to by the eyewitnesses in the classroom were not apparently unlawful to any of the adults

30

within that classroom, as no mention of her conduct was made or brought to the attention of any individual until the time when the aides, Celli and Medeiros, decided to come forward with their own grievances which included their own treatment within the classroom, not to mention their angst toward their salary and work hours. In fact, when Celli and Medeiros mentioned to the NEIU that there were instances of alleged abuse to the minor children by Wzorek, those allegations as stated and purportedly witnessed, did not lead the NEIU to believe as though serious physical or emotional injury was placed or being placed upon the children. As such, it is respectfully requested that all constitutional causes of action outlined in Plaintiffs' Second Amended Complaints be dismissed, with prejudice, and that Summary Judgment be granted in favor of Defendant, Wzorek.

   **B.  Violations of the Fourteenth Amendment** - The substantive component of the due process clause "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." Gottlieb v. Laurel Highlands School District, 272 F.3d 168, 172 (3d Cir. 2001) (quotations omitted). Only State conduct that is "arbitrary, or conscience shocking, in a constitutional sense" rises to this level. County of Sacramento v. Lewis, 523 U.S. 833, 847 (1998).

   "The constitutional concept of conscience - shocking duplicates no traditional category of common-law fault..." Lewis, 523 U.S. at 848. The pertinent inquiry is "whether the force applied caused injuries so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." Jones v. Witinski, 931 F. Supp. 364, 369 (N.D. Pa. 1996) (quoting Webb v. McCullough, 828 F.2d. 1151, 1158 (6th Cir. 1987)).

The allegations of the abuse identified by the Plaintiffs have been specifically set forth in Defendant's Statement of Facts within this Brief. Plaintiffs' Second Amended Complaints stem from allegations of abuse as witnessed by Celli and Medeiros, two of the aides in the classroom. Those aides as well as other adults in the classroom have been deposed in this matter and each of the adults were specifically questioned about the allegations of abusive conduct against Wzorek. The factual testimony of record, even if viewed in a light most favorable to the Plaintiffs, does not amount to "conscience shocking" behavior on behalf of the Wzorek.

It is Plaintiffs' burden to prove that Wzorek was so inspired by malice or sadism or was using an excess use of zeal that her conduct was brutal and inhumane to the minor autistic children. It has been held that a single slap to the face, see <u>Lillard v. Shelby County Board of Education</u>, 76 F. 3d 716, 725-26 (6th Cir. 1996), or punch to the chest of a student, see <u>Kurilla v. Calahan</u>, 68 F. Supp. 2d. 556, 564 (N.D. Pa. 1999) was conduct insufficient to "shock the conscience". As such, and based upon the deposition testimony of what Celli, Medeiros, Smith, and Jackson witnessed in class, as well as the testimony of Wzorek, herself, this conduct is not "conscience shocking" and Plaintiffs have failed to establish a substantive due process violation for failure to protect the minor Plaintiffs' bodily integrity.

With respect to the equal protection claims being made by the Plaintiffs, the Equal Protection Clause requires that the law treats similarly situated people alike. U.S. Const. amend. XIV, §1; <u>Cleburne v. Cleburne Living Center</u>, 473 U.S. 432, 439 (1985). Plaintiffs are alleging an equal protection claim based upon Wzorek's discrimination against the minor Plaintiffs based on their collective handicap. The record is completely devoid of any evidence or testimony that Wzorek had an intent to disadvantage all of the minor Plaintiffs in her classroom that were diagnosed with autism

or for any other reason for which they were enrolled in special education classes. Additionally, there is no evidence established by the Plaintiffs that Wzorek was treating any students in this classroom in a manner that was different from her treatment of other students in her classroom, and as such, Plaintiffs' substantive due process claims or any violation of the Equal Protection Clause should be dismissed, with prejudice.

     **C.**    **IDEA 20 U.S.C. 1400 et seq.** - In the matter of <u>Taylor v. Altoona Area School District</u>, 513 F. Supp. 2d. 540 (W.D. Pa., 2007), the District Court held the following as it pertained to allegations of certain violations of the IDEA, stating as follows: "The IDEA provides both disabled students and their parents with private means of redress." <u>Winkleman v. Parma City School District</u>, 127 S. Ct. 1994, 2006, 167 L. Ed. 2d. 904, 922 (2007). It is this Court's view, however, that the statutory scheme contemplates that such redress will be pursued against the recipients of the federal funds rather than against individuals employed by those recipients. The detailed remedial scheme established by the IDEA, which the United States Court of Appeals for the Third Circuit recently found to preclude a complimentary remedy under Section 1983, precludes an implied private right of action against individuals for the same reason. <u>A.W. v. Jersey City Schools</u>, 486, F.3d. 791 (3d Cir. 2007). <u>Taylor</u> at 31-32."

     The Courts have also concluded that liability under the IDEA does not extend to individual actors such as Defendant, Wzorek. <u>Colon v. Colonial Intermediate Unit 20</u>, 443 F. Supp. 2d. 659, 669 ( N.D. Pa. 2006); <u>P.N. v. Greco</u>, 282 F. Supp. 2d. 221, 239 (D.N.J. 2003).

     Notwithstanding the fact that individual Defendants, such as Wzorek, can not be held liable under the IDEA, the United States District Court for the Eastern District of Pennsylvania recently addressed the recovery of monetary damages available under the IDEA for the  alleged failures to

provide students with a free, appropriate public education. In the case of <u>Annika T. v. Unionville</u>

<u>Chadds - Ford School District</u>, 2009 W L 778350 E.D. Pa., March 24, 2009, (NO.  CIV. A. 08-

4944), a copy of which is attached hereto and marked as Exhibit " ", it was indicated that the Court

of Appeals has not yet resolved whether monetary damages are available for violations of the IDEA.

<u>Bucks County Department of Mental Health/Mental Retardation v. Commonwealth of Pennsylvania</u>,

379 F.3d. 61, 68 (3d Cir. 2004). However, they note that the underlying majority of other Courts of

Appeals as well as Judges within the Eastern District, have reasoned that such damages are not an

"appropriate remedy" given that the purpose of the IDEA is to ensure that each child with a disability

has available to them a free appropriate public education.  <u>20 U.S. C. § 1400 (d)(1) (A)</u>-(B); <u>Sellers</u>

<u>v. School Board of Manassas</u>, 141 F.3d. 524, 526-28 (4th  Cir. 1998); <u>Brandon v. Chichester School</u>

<u>District</u>, No. 06-4687, 2007 WL 2155722 (E.D. Pa. July 25, 2007); <u>Ronald v. The School District</u>

<u>of Philadelphia Board of Education</u>, No. 05-2535, 2007 WL 4225584, *10 (E.D. Pa. November 29,

2007).

Those Courts have articulated their concern with awarding tort-like damages under a statute

whose purpose is to ensure that children with disabilities receive the education to which they

entitled. <u>Id</u>.  The <u>Annika T.</u> Court agreed with that reasoning and were persuaded that the IDEA's

primary purpose is to ensure FAPE, not to serve as a tort–like mechanism for compensating personal

injuries. *citing* <u>Nieves -Marquez v. Commonwealth of Puerto Rico</u>, 353 F. 3d 108, 125 (1st Cir.

2003). Based on the above,  Defendant, Wzorek is entitled to Summary Judgment as a matter of law

as it pertains to Plaintiffs' claims under the IDEA.

**D.     Assault and Battery** - In Pennsylvania the common law torts of assault and battery

are consolidated under the term "assault" and a person is guilty of assault if he either "attempts to

cause or intentionally, knowingly, or recklessly causes bodily injury to another" or "attempts by physical menace to put another in fear of eminent, serious, bodily injury." <u>Commonwealth v. Jackson</u>, 907 A.2d 540 (Pa. Super. 2006). An assault is an intentional attempt by force to do an injury to the person of another and a battery is committed whenever the violence menaced in an assault is actually done, though an ever so small a degree upon the person. <u>Butler v. Stockdale</u>, 19 Pa. Super. 98, 107. (1902).

When reviewing the evidence of record and the testimony as elicited by the individuals who testified as to what they saw Wzorek do with the minor Plaintiffs; this conduct would not arise to an attempt or intent to cause serious bodily injury. In fact, Plaintiffs have failed to establish that any of the alleged physical conduct toward any of the minor Plaintiffs led to any type of bodily injury, let alone serious bodily injury. Additionally, at no point in time during the two years that Defendant, Wzorek taught the autistic support classroom was it even mentioned that as a result of the alleged abuse from Wzorek, that the students required any medical attention whatsoever. Additionally, the record has not established that Wzorek attempted by way of physical menace to put the minor Plaintiffs in fear of imminent, serious bodily injury at any time. In fact, none of the adult individuals that testified in this matter, including the aides, Celli and Medeiros as well as the TSS Workers, Smith and Jackson, had even remotely indicated that it was Wzorek's intent to cause some sort of bodily injury to her students. As such, Wzorek respectfully requests that the state law claims of Assault and Battery be dismissed, with prejudice.

**E.    Intentional Affliction of Emotional Distress** - "In order to prove a claim of intentional affliction of emotional distress, the following elements must be established: (1) the conduct must be extreme and outrageous; (2) it must be intentional or reckless; (3) it must cause

emotional distress; (4) a distress must be severe." <u>Hoy v. Angelo</u>, 691 A.2d 476, 482 (Pa. 1997).

Extreme and outrageous conduct is conduct which is "so outrageous in character, and so extreme in

degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly

intolerable in a civilized society." <u>Strickland v. University of Scranton</u>, 700 A.2d. 979, 987 (Pa.

Super. 1997).

Generally, "the case is one in which the recitation of the facts to an average member of the

community would arouse his resentment against the actor and lead him to exclaim, 'outrageous'! <u>Id</u>.

In addition to requiring that a Plaintiff establish that the conduct complained of was

outrageous, the Pennsylvania Supreme Court has required that the Plaintiff present competent

medical evidence to support the claim. <u>Kazatsky v. King David Memorial Park</u>, 515 Pa. 183, 197,

527 A.2d. 988 (1987).

Initially, Defendant Wzorek submits to the Court that while Plaintiffs made specific

allegations of conduct attributable to Wzorek, this conduct was either unsubstantiated by the factual

witnesses within the classroom or was truly indicated to be conduct that did not arise to the level of

characterization by the Plaintiffs in their Second Amended Complaints. Plaintiffs have failed to

establish any indication that Wzorek intended to cause emotional or physical harm to any of the

minor Plaintiffs for any purpose whatsoever. Additionally, Wzorek indicated that the conduct for

which Plaintiffs claim she was abusing the minor children was actually conduct that she believed

was utilized for the safety of the minor children or for some other purpose, including an educational

purpose. Regardless, that purpose was never to inflict bodily or emotional injury.

Plaintiffs have not established any serious physical injury to any of the children and there has

been no competent medical evidence to support any serious bodily harm to the minor Plaintiffs. As

it pertains to their claims for severe emotional injuries, it is submitted to the Court that when Celli and Medeiros informed individuals including the parents of the minor Plaintiffs of the allegations of abuse within the classroom, this occurred sometime around the Spring or Summer of 2003. It was not until the end of July, 2006, before the Plaintiffs' attorneys sent the minor children to be evaluated for purposes of an Independent Psychiatric Evaluation. It is submitted that the securing of Independent Psychological Evaluations for purposes of litigation is not competent medical evidence to support Plaintiffs' claims for severe emotional injuries. As such, it is requested that Plaintiffs' claim for intentional infliction of emotional distress be dismissed, with prejudice.

   **F.**  <u>**Breach of Fiduciary Duty**</u> - "A fiduciary relation exists between two persons when one of them is under a duty to act for or give advise for the benefit of another upon matters within the scope of the relation." <u>Restatement</u> (Second) of Torts Section 874 (a) (1979). A relationship of blood, business, friendship or association may give rise to a fiduciary relationship.(<u>Edelstein & Diamond, LLP. v. Orloff</u>, 2005, WL 1648191 * 2 (Pa. Com. Pl.)). The critical question is whether the relationship goes beyond mere reliance on superior skill, and into a relationship characterized by "overmastering influence" on one side or "weakness, dependence or trust justifiably reposed" on the other side. <u>eToll, Inc. v. Elias/Sevion Advertising, Inc.</u>, 811 A.2d 1023 (Pa. Super. 2002). Section 874 of the <u>Restatement</u> (Second) of Torts reads as follows: "A person standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of the duty imposed by the relationship." "A person in a fiduciary relation to another is under a duty to act for the benefit of the other as to matters within the scope of the relation...fiduciary relations include not only the relation of trustees and beneficiaries, but also, among others, those of guardians and wards, agents and principals, attorney and client." See, (b) <u>Restatement</u> (Second) of Trusts.

Counsel for Wzorek, herein, has not found any case law wherein the relationship between a teacher and his or her student was defined as a fiduciary relationship. As such, it is respectfully submitted to the Court that a breach of fiduciary duty claim does not exist under Pennsylvania Law which would allow a student to proceed against a teacher under that theory. Essentially, it is submitted that a breach of fiduciary duty claim is an attempt to get around a negligent supervision claim, which the Pennsylvania State Courts have consistently held do not fall within any of the enumerated exceptions the Political Subdivision of Tort Claims Act set forth in 42 Pa.C.S.A. § 8542 et al.. *See* Dorsch by Dorsch v. Butler Area School District, 105 Pa. Cmwlth. 519, 525 A.2d 17 (1987); Messina v. Bairesville-Saltsburg School District, 94 Pa. Cmwlth. 100, 103 A.2d 89 (1986); Mooney by Mooney v. North Penn School District, 90 Pa. Cmwlth. 7, 493, A.2d 795 (1985); Close v. Voorhees, 67 Pa. Cmwlth. 205, 446 A.2d 728 (1982).

Based on the above, Wzorek respectfully requests that Plaintiffs' breach of fiduciary duty claim be dismissed, with prejudice. However, even if this Court were to allow such a claim to move forward on behalf of the minor Plaintiffs against Wzorek, their teacher; it is submitted that the testimony and evidence of record has failed to establish that Wzorek, in some way, benefitted by any of the alleged conduct which she purportedly utilized on the minor Plaintiffs. It is proffered that for a breach of fiduciary duty claim to move forward, the Court would need to look at the Defendant's actions to determine if those actions offered a benefit to her while at the same time creating a deprivation of that same benefit to the minor Plaintiffs. As such, Wzorek respectfully requests that this Court dismiss Plaintiffs' claims for breach of fiduciary duty against Defendant Wzorek, with prejudice.

G.     **Punitive Damages** - In order to set forth a cause of action for punitive damages in Pennsylvania, Plaintiffs must demonstrate that Defendant acted outrageously, i.e. that the Defendant acted with bad motives or with reckless indifference. Chamber v. Montgomery, 192 A.2d 355, 358, (Pa. 1963). Punitive damages may not be imposed for misconduct which constitutes ordinary negligence such as inadvertence or mistaken errors of judgment. Martin v. Johns-Manville Corp., 494 A.2d, 1088, 1098, (1985). Nor are punitive damages justified when the Defendant's mental state arises to no more than gross negligence. Id. Accordingly, a claim for punitive damages  must be based on conduct which is malicious, wanton, reckless, willful or oppressive. Feld v. Merriam, 485 A.2d 742, 748 (Pa. 1984).

Upon reviewing a claim for punitive damages, the proper focus is on the act itself which is the subject of the punitive damage claim and not the end result. Feld, 485 A.2d. at 748.  Moreover, the state of mind of the actor is vital in reviewing a claim for punitive damages since punitive damages will only be granted when Plaintiff can establish that the act was intentional, reckless, malicious, or when the Plaintiff demonstrates "evil motives" or "reckless indifference" on the part of the Defendant. Rizzo v. Haines, 555 A.2d 58, 69 (Pa. 1989); Feld, 485 A.2d at 748. Under these principles, the imposition of damages to punish a civil Defendant is appropriate only when the conduct complained of is especially egregious. Martin v. Johns-Manville Corp., 494 A.2d at 1096-1097.

Plaintiffs have failed to establish, and the record is devoid of any facts, to support a proposition that Wzorek, through her conduct, was creating a high degree of risk of physical harm to the minor Plaintiffs in this matter. Wzorek, along with her aides, Celli and Medeiros, as well as the TSS Workers, Smith and Jackson, testified that at times it was difficult to control these students

because they were nonverbal and they would physically act out. Wzorek testified on numerous occasions that it was her intent to find a way to protect the kids for their own safety as well as the safety of others within that classroom.  It is submitted that even if this Court were to determine that her methods may not have been acceptable for one reason or another,  this is not enough to support that Defendant utilized her techniques in such a manner and in such a high degree of recklessness to cause physical harm to the children within her classroom.

## V.    <u>CONCLUSION</u>

Based on the foregoing and the legal authorities relied upon herein, Defendant, Wzorek, respectfully requests that this Honorable Court enter an Order granting her Motion for Summary Judgment on all remaining Counts against her as it pertains to all seven (7) cases which have been consolidated for purposes of pre-trial proceedings.

*Respectfully submitted,*

**POLACHEK & ASSOCIATES, P.C.**

*/s/ Richard A. Polachek*
**RICHARD A. POLACHEK, ESQUIRE**
**Attorney ID # 35283**

*/s/ Thomas P. Clark*
**THOMAS P. CLARK, ESQUIRE**
**Attorney ID # 90673**

**POLACHEK & ASSOCIATES, P.C.**
**Phoenix Plaza, Suite 600**
**22 E. Union Street**
**Wilkes-Barre, PA 18701**
**(570) 822-8515**
**PolachekLaw@epix.net**
**Counsel for Defendant,**
**SUSAN COMERFORD WZOREK**

40

## <u>CERTIFICATE OF SERVICE</u>

I, Thomas P. Clark, Esquire, hereby certify that on April 15, 2009, I did serve upon all parties and/or counsel of record DEFENDANT, SUSAN COMERFORD WZOREK'S, BRIEF IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT via the Court's Electronic Filing System to the following recipients:

Lawrence J. Moran, Esquire
James Conaboy, Esquire
Edwin A. Abrahamsen, Jr., Esquire
Christina Coury, Esquire
Abrahamsen, Moran & Conaboy
1006 Pittston Avenue
Scranton, PA 18505

Robin B. Snyder, Esquire
Marshall, Dennehey, Warner, Coleman & Goggin
The Scranton Center, Suite 400
Scranton, PA 18510

John E. Freund, Esquire
King, Spry, Herman, Freund & Faul, LLC
One West Broad Street, Suite 700
Bethlehem, PA 18018

**POLACHEK & ASSOCIATES, P.C.**

*/s/ Thomas P. Clark*
_____
**THOMAS P. CLARK, ESQUIRE**
**Attorney ID # 90673**

**POLACHEK & ASSOCIATES, P.C.**
**Phoenix Plaza, Suite 600**
**22 E. Union Street**
**Wilkes-Barre, PA 18701**
**(570) 822-8515**
**Counsel for Defendant,**
**SUSAN COMERFORD WZOREK**

41